## ABIGAIL NICKERSON *vs.* NATHAN BUCK.

Affixing a cross by a testator to his will, as and for his signature, is a sufficient signing within the Rev. Sts. *c.* 62, § 6.

It is not necessary under Rev. Sts. *c.* 62, § 6, that the attesting witnesses to a will should actually see the testator sign the will; it is sufficient if they hear him acknowledge it to be his will; and this acknowledgment may be by acts, if clear and explicit, as well as by words.

If an attesting witness to a will has since deceased, proof of his handwriting is *primâ facie* evidence that he duly and properly attested it.

In this case, the decree of the probate court allowing the will was affirmed, with costs of this court to the appellee.

THIS case was tried before the chief justice, at May term, 1852, who reserved the case for the consideration of the whole court, upon the following report:

This is an appeal from the decree of the judge of probate, allowing and admitting to probate the will of Joshua Buck, deceased, taken by a daughter and heir at law of the deceased. An issue had been joined upon the question of the sanity and capacity of the testator to make a will, and the case was opened to the jury; but subsequently the appellant waived all exception to the sanity and capacity of the testator, and relied only upon the ground that the will had not been duly executed according to the requirements of law. This being a question solely for the court, the jury were discharged from its further consideration, and I proposed, at the request of both parties, to report the evidence from which the whole court will decide whether the will was duly executed and ought to be admitted to probate or not, and enter a decree accordingly.

" Joshua Buck was an old man, and lived at Chatham; the will purported to bear date the fifth day of January, 1848, and to be attested by John Kenrick, Joseph Buck and Seth Bearse. It appears by the deposition of Tabitha Buck, the widow of the deceased, that the will was written by John Kenrick, Esq., the first attesting witness, and that he has since deceased. The executor offered the following evidence:

Joseph Buck, who testified, after looking at the will: That attestation is my handwriting, and he assented to it as his

will. The will was on the table; he was sitting by the fire in the same room. Mr. Bearse signed directly after me. Mr. Kenrick was there, I cannot say that I saw him sign it. Do not remember of particular conversation with Mr. Buck. I staid some time, should think half an hour, perhaps a little more or less. I had no thought of his being insane, or but what he was as capable of making a will as he ever was. I have long known him, say thirty years. I knew no difference in mind when he signed the will, from what he had been; his bodily health was impaired, as I thought, but not his mind. Nathan Buck came to call me. When I went into the house, Mr. Kenrick was there, the two old folks, Joshua Buck and his wife, and Mr. Bearse, the other witness. After it was signed, Mr. Kenrick said, Shall I take care of this will? and Mr. Buck said yes. He assented that this was his last will.

On cross-examination, he said: When I went into the room, Mr. Kenrick asked Mr. Buck if these were the men that he wished to attest his will, and, as near as I can now remember, he said yes. Mr. Kenrick then asked me to go and sign the will. I did not see the paper in Mr. Buck's hands. I did not see any one show it to Mr. Buck and ask him if it was his signature. Did not see him make the mark on the will. Don't know that he saw the will. Mr. Buck's distance from the table where the will lay, was about twelve or fifteen feet. Mr. Buck assented. Mr. Kenrick did not ask in so many words, of Mr. Buck, if that was his last will, but, as I understood, he meant that. He told me that Mr. Buck wanted me to sign it as a witness. Think this was in January, 1848. I cannot say that I had been there at any particular time previous. I was there generally three or four times a year, or once in two or three months, but I cannot recollect the time particularly. I had never heard anything about Mr. Buck's state of mind in regard to sanity, before signing the will. After I went in, I did not see pen put to paper, by anybody, till I put my name as witness (second in the order of signing, Kenrick being the first). On reëxamination, he said: the will lay where Mr. Buck could see it.

Seth Bearse testified as follows: This is my name as at-

testing witness. I put it there. I was called to go to Joshua Buck's. I went in with Joseph Buck. Mr. Kenrick was there. The table was nearly in the middle of the room. Mr. Buck, the testator, was nearly opposite the table, so as to look square on to the table, and three or four feet distant from it. As soon as I went in, Mr. Kenrick asked the old gentleman, " are these the men ? " and he said yes. Then Esquire Kenrick asked us to sign the will, Joshua Buck's will. Mr. Kenrick said : This is Joshua Buck's will, and he wants you to sign it as witnesses. He heard what Mr. Kenrick said, and expressed his assent, either by saying " yes," or by nodding. Cannot say that he did it in words, but I do not say that he did not. I did not see him make the mark or take the paper in his hand. I did not see Mr. Kenrick sign as a witness. Did not see the paper taken up at all. I saw Mr. Joseph Buck, the witness, sign it, and I signed it right after. I do not remember that the attestation clause was read. Am confident the paper was not taken up from the table, till I signed it. Am confident the paper was where the old man could see it. Was there half or three quarters of an hour after the will was signed. I was particular in observing his act and the operations of his mind, in consequence of what I had heard, and I formed the opinion that he was as capable of doing an act requiring a sound mind, as he has been for fifteen or twenty years. I am of the same opinion now. He seemed bright and active as I have seen him before. I had known him more than thirty years. His bodily health was weak and feeble, but he got up and walked across the room whilst I was there."

On cross-examination, he said : " I went in with Mr. Joseph Buck. I saw Joseph Buck sign the will. The testator, I think, did not change his place, a little distance from the table, till after the business of the will was finished. What Mr. Kenrick said when I first went in, was this. He turned round to the old gentleman and asked, " Are these the men ? " and he assented. He then asked us to put our names to it as witnesses, to which the old gentleman assented. I do recollect that he said the words ; This is Joshua Buck's will.

I saw the will at the time, lying on the table. In saying that Joshua Buck assented, I can't say there was anything more than a nod of the head. I knew it was intended to express his assent. I stood near and saw his expression of countenance.

James Long testified : 1 know the handwriting of Esquire Kenrick. Have seen him write. This name, as an attesting witness to this paper, is in his handwriting. I think the body of the will is in his handwriting.

The executor here offered the deposition of Tabitha Buck, widow of the testator, the material portions of which were as follows:

My age is eighty-two years. I am the widow of Joshua Buck, deceased. My husband made a last will. I was present when it was written by John Kenrick. He gave directions to Esquire Kenrick how to write the will? Mr. Kenrick came in, and he asked him if he could write a will which would stand law, and he said he could, and he then told him to sit down and do it, and when it was written, he told him to keep it and not let anybody have it while he was alive. His health was so that he was up, and about, and he appeared as sensible as he ever had. His mind did seem to fail some, a year or more before he died.

On cross-examination, the deposition was as follows :

1. Who was present in the room with your husband when Mr. Kenrick came in? Mr. Joseph Buck and Seth Bearse.

2. How long did you stay in the room after Mr. Kenrick came in? I think I was in the room all the time when Mr. Kenrick was writing the will.

3. How long did Mr. Kenrick stay in the room, and how long was he in writing the will? I guess he was an hour or more in the room, and he was a spell, I do not know precisely how long, writing the will.

4. Did Mr. Kenrick stay in the room after writing the will, and if so, how long? He staid a spell and went away.

5. Will you swear that you were in the room all the time Mr. Kenrick was writing the will? I think I should. I do not remember that I went out.

6. When did Mr. Joseph Buck and Mr. Seth Bearse first leave the house, after Mr. Kenrick first met them there? I do not know as I can tell exactly, but it was not till after the will was signed.

7. Were Mr. Joseph Buck and Mr. Seth Bearse in the room all the time Mr. Kenrick was writing the will? Yes, sir.

8. Had Mr. Kenrick finished writing the will when Buck and Bearse came in? No, sir, they sat looking on.

9. Had Mr. Kenrick commenced to write the will, when Buck and Bearse came in? He was writing it out when they came into the house.

10. How long had Mr. Kenrick been writing when Buck and Bearse came in? I guess he had been about an hour.

11. How long was Mr. Kenrick writing the will after Buck and Bearse came in? I should say an hour and a half.

12. Where was your husband when Mr. Kenrick was writing the will? was he abed, or sitting up, and where was Mr Kenrick sitting? He was sitting up in a chair, and Mr. Kenrick was sitting there in the room.

13. How long was it from the time when Mr. Kenrick first went into the room, before he left? I guess it was as much as two hours or more.

14. How long did Mr. Kenrick stay in the room after the will was written? Two hours or more.

15. How long, after Mr. Kenrick came into the room, did Buck and Bearse come in? Half an hour, I should guess.

16. In what year did your husband's mind begin to fail him? About a year before he died, but I do not recollect what year that was.

17. Will you swear to any one direction which you heard your husband give Mr. Kenrick about the contents of his will? I only recollect that he gave Mr. Kenrick directions how to write the will, but I cannot state any particular direction.

18. Was the will read over after it was written? and if so, do you remember any of its provisions? It was read after written, but I do not recollect anything it contained.

The appellant then offered the following evidence:

Sally Crowell, who testified: I knew Joshua Buck. Am his daughter. I lived next neighbor to him, and was there often. His eyesight was very poor. He could not read. It was several years before his decease. In 1847 and 1848 he wasn't able to read.

James Long called again: I knew the testator very well. He was about ten years older than I. Don't know anything of his eyesight, more than of other old men. I saw him often up to 1847. Have known him look over a deed and seem to understand it, reading with spectacles. Made a deed for him in 1846 or 1847. In January, 1846, wrote a will — this is it — sometimes he wrote his full name, and sometimes made his mark. In December, 1847, he executed this deed. I met him once afterwards, he recognized and spoke to me.

Polly Kendrick: Was acquainted with Joshua Buck. Knew him thirty years. Saw him three years ago last January. I heard him say his eyesight was not good. Haven't heard him speak of it at any other time.

Jacob Smith: Was at Harwich the day the will was proved. Mr. Joseph Buck was out there. He said he had got to come over to Barnstable to prove the will. Said the will was on the table covered up. He did not see the will.

Joseph Buck called again: Something took place with Mr. Smith, somewhat as he has stated it. I understood him to ask if I read the will or knew its contents. I told him I did not know a word of it.

The appellee and executor then offered further evidence as follows:

David H. Bearse: In 1848 knew Mr. Buck. Saw him in the road and about his premises. I went in and saw him reading. He was looking on a book and apparently read. He said my eyesight doesn't fail me yet. He read without spectacles. Have heard him say his sight had rather improved of late years. On cross-examination, he said: I am confident it was in 1848, that is, to the best of my knowledge.

Samuel Bassett testified: I knew him. Took some land of him in 1847. Saw him frequently. He knew me and spoke to me, when I met him in the road.

Dr. Daniel P. Clifford : Knew Mr. Buck some. I saw him towards the last of his going out. He complained of his hands, but said his eyesight had improved of late years. On cross-examination : It was three or four years ago. Don't know the year, it was towards the last of his going out.

Joshua Nickerson testified : Knew Mr. Buck. Saw him the latter part of 1847, and again in 1849. He recognized me, and stopped to talk with me, when I met him in the road.

Daniel Howes testified : I knew Mr. Buck. He had some dealings at my store in 1846, 1847, and 1848. I noticed no difficulty with his eyesight, and never knew him complain of it. He came alone, came with a horse and wagon, and got in and out well. His account ended in May, 1848.

On this evidence, the case was submitted to the whole court, upon the question of the due execution, attestation, and publication of this will, and according to their opinion thereon, to affirm or reverse the decree of the judge of probate allowing the will of Joshua Buck, and admitting the same to probate. The question of costs, especially those incident to the trial of the issue of sanity and undue influence, is reserved.

*J. M. Day,* for the appellant. 1. The will must be signed by the testator. Rev. Sts. *c.* 62, § 6. 2. When a mark appears, instead of the testator's name, the inquiry is more close than in ordinary cases. *Baker* v. *Dening,* 8 Ad. & Ell. 94. 3. The will must be signed by the testator before the attestation of the witnesses. Rev. Sts. *c.* 62, § 6. 4. When the testator does not sign the will in the presence of the attesting witnesses, there must be an acknowledgment by the testator that it is his will. *Ellis* v. *Smith,* 1 Ves. jr. 11; *White* v. *British Museum,* 6 Bing. 310; *Dewey* v. *Dewey,* 1 Met. 353, and cases there cited. 5. Although this acknowledgment may be inferred from acts as well as from words, yet the acts must be definite in their character, and must point directly to such acknowledgment; so that if a mere reference is made to a paper in the possession of another person, and not held in

the testator's custody, or if it is folded up, and there is no pointing to or referring to the signature, and the testator publicly declares and acknowledges such document to be his will, this would not be such acknowledgment as to supersede the necessity of an actual signature in the presence of the witnesses, and would not warrant a jury in finding that the will was duly signed in the presence of the witnesses. *Hall* v. *Hall,* 17 Pick. 375, 379.

6. It must appear that the testator knew that it was his will which the witnesses attested. *Hall* v. *Hall,* 17 Pick. 379 ; *White* v. *British Museum,* 6 Bing. 310 ; *Dewey* v. *Dewey,* 1 Met. 349 ; *Hogan* v. *Grosvenor,* 10 Met. 57 ; *Addy* v. *Grix,* 8 Ves. jr. 505 ; *Remsen* v. *Brinckerhoff,* 26 Wend. 325 ; *Swett* v. *Boardman,* 1 Mass. 258. 7. The will must be attested and subscribed by three or more competent witnesses in the presence of the testator. Rev. Sts. *c.* 62, § 6.

The appellant deems the following leading facts proved by the evidence in this case :

That the acts of acknowledgment by the testator were very indefinite and inconclusive, and related to a paper produced by another person than the testator, and at no time in the custody of the testator ; that there was no pointing to or referring to the signature. That the testator's mind began to fail him a year before the alleged signing of the will. That the testator's eyesight was dim, and his health was very much impaired. The will was covered by other papers. There were but two attesting witnesses to the will. And generally, that the evidence in this case does not support the requirements stated in the legal points relied upon by the appellant.

*G. Marston,* for the appellee. 1. It is settled that it is not requisite that all the witnesses should be present at the same time. *Dewey* v. *Dewey,* 1 Met. 352. 2. It is settled that if the witnesses are where the testator could see them attest the will, it is attested in his presence. 1 Met. 352.

3. It is not required that the testator should sign the will in presence of the attesting witnesses. 1 Met. 352. An acknowledgment of his signature is sufficient. And a recognition of the paper as his will, before the witnesses, is sufficient

to authorize their attestation to it, and to make it a good will. 1 Met. 352; 1 Ves. jr. 11; 1 Ves. & Beames, 362; 6 Bing. 310; 7 Bing. 457; 1 Cr. & Mees. 140; 10 Met. 56; 4 Kent Com. 572. Not what is said, but what is done at the execution, is to be regarded. If the testator acknowledge the paper as his will by acts, it is as effectual as if done in words. 6 Bing. 310; 1 Met. 354; 10 Met. 56. The question here is, whether, upon the evidence in the present case, it may reasonably be inferred that the testator signed his name to the instrument as and for his will, and that he afterwards acknowledged and recognized the paper as his will before the witnesses, either directly or by acts equivalent to an acknowledgment. What is the evidence? John Kenrick, the first subscribing witness, being dead, and his handwriting being proved, it is to be presumed that he would testify to the due execution of the will, as stated in the attestation clause. Even if there were no attestation clause, after the death of a witness or witnesses, " a compliance with the statutory requisition in all its parts, would, it seems, even in the absence of express statement, generally be presumed." 1 Jarm. on Wills, 118; *Hands* v. *James*, Comyns, 531; *Croft* v. *Pawlet*, 2 Str. 1109.

It is to be presumed, from the order of the names, that John Kenrick signed as a witness before Buck and Bearse. It is proved, we say, by John Kenrick's signature, that the testator had signed the will before Kenrick attested it, and therefore it is proved to have been signed before Buck and Bearse attested it. John Kenrick states, under his handwriting, that the mark, " his mark," is Joshua Buck's signature. The testator acknowledged the paper to be his will before all the witnesses, and requested Buck and Bearse to attest it and in so doing, he, in effect, declared that he had signed it as his will, and his signature is, in fact, to be presumed from those acts. The testimony proves clearly an acknowledgment of the paper as his will in presence of Kenrick, Buck, and Bearse, after it had been signed. It can hardly be supposed that the testator, who was by his own active agency procuring the authentication of the instrument by the requisite wit-

nesses, would have omitted the first step necessary to its due execution, viz : the signature by himself. 1 Met. 354. The witnesses all concur that the testator was in comfortable health, and of sound mind. It is proved by Mrs. Buck that he was procuring the execution of the will by his own active agency, uninfluenced by any one.

Upon the whole evidence it appears that the will was duly signed by the testator in presence of Kenrick ; and being thus signed, he, by his acts, if not by his declarations, sufficiently recognized and acknowledged his own execution of it, to authorize the other two witnesses to attest and subscribe the same as witnesses thereto, in accordance with the provisions of the statute.

The appellee is entitled to full costs if the decree of the court of probate is affirmed. If the decree should not be affirmed, he is entitled to costs of the travel and attendance of all witnesses brought to testify on the issue of sanity, incompetency having been the only reason of appeal filed, and afterwards withdrawn by the appellant. Rev. Sts. *c.* 121, § 16 ; *c.* 83, § 47.

DEWEY, J.[1] All that is requisite to the due execution of a will is the actual signature of the same, written by the testator, or by some one in his presence and by his express direction, and that the will " be attested and subscribed, in the presence of the testator, by three or more competent witnesses." Rev. Sts. *c.* 62, § 6.

The signature of the testator in this case was, so far as he personally subscribed it, a signature by making a X, but his name was appended to the cross to indicate the intended signature ; and, from the comparison of handwriting, it is quite obvious that it was thus written by John Kenrick, whose name is first borne on the list of attesting witnesses. It is proved that this witness had deceased before the trial ; but the death of an attesting witness, or of all the attesting witnesses,

---

[1] This and the four following cases were argued and decided at the October term, 1852, at Taunton, at which were present the CHIEF JUSTICE, and DEWEY, METCALF, BIGELOW, and CUSHING, JJ.

is not to defeat the validity of the will, if, in fact, duly executed. It changes the form of the proof, and allows of the introduction of secondary evidence of the due attestation and execution of the will. Such attestation is then to be shown, as it would be in the case of deeds, by proof of the handwriting of the witness. That being shown, *primâ facie*, it is to be taken to be true, and to have been put there for the purpose stated in connection with the signature. It is to be assumed, as regards that witness, that he duly attested the will in the presence of and at the request of the testator. In considering the sufficiency and weight of the evidence to establish the due and proper execution of this will, the fact of the death of this witness, and the presumptions that arise from proof of his handwriting, are somewhat material. As regards this witness, if nothing appears in other parts of the evidence to control the presumption resulting from proof of his handwriting, it may be taken that, as to his attestation, it was properly made to the signature by the testator.

The question then arises upon the attestation by the two remaining witnesses. Neither of these latter witnesses saw the testator write his name, or actually make his mark, which was the form of the signature. But it has long since been decided that it is not essential that an attesting witness to a will should see the testator sign his name. All that is necessary for him to know from the testator is that the signature of the will is his, or written by his direction, and adopted by him. Hence, if the witness be requested by the testator to sign his name to an instrument as an attesting witness, and the testator declares to the witness that the signature to the will is his, that is abundantly sufficient. But the adjudicated cases go further, and hold that the actual signature by the testator may be made known to the witness in other modes than an express declaration to the witness that the will is his. Any act or declaration that carries by implication an averment of such fact is equally effectual. Hence it has been repeatedly held that a declaration by the testator to the witness, that the instrument is his will, or even a request by him to the witness to attest his will, or other varied form of expression implying that the

same had been signed by the testator, are either of them quite sufficient. The cases of *Ellis* v. *Smith*, 1 Ves. jr. 11; *Westbeech* v. *Kennedy*, 1 Ves. & Beam. 362; *Hall* v. *Hall*, 17 Pick. 373; *Dewey* v. *Dewey*, 1 Met. 349; and *Hogan* v. *Grosvenor*, 10 Met. 56, fully sustain these positions.

The testimony reported for our consideration in the case, taken together, establishes clearly the fact that the testator, Joshua Buck, intended to execute a will, and did in fact execute some instrument supposed by him to be a will. He requested Mr. Kenrick to write a will; " to write one that would stand." He knew two persons were called in to witness his will, in addition to Kenrick. This fact was brought distinctly before his mind, and he assented to these persons as the witnesses he wished for that purpose. He saw these persons write their names to some paper. The request to these witnesses to attest his will was quite enough to authorize the inference that he had executed a paper as a will, and was equivalent to his acknowledgment that he had signed some paper as a will.

The only objection to the sufficiency of this evidence is, that possibly there may be some uncertainty whether the instrument to which these two persons appended their names was the paper to which the testator referred when he spoke of his will, or assented to Mr. Kenrick's statement in his behalf, to the witnesses, as to his executing the will. It is true that in the present case, the paper to which the testator referred was not at the moment in his own hands, as it was in some of the cases cited. It is necessary that it be reasonably established by the evidence that this instrument is the same as the one referred to by the testator as his will. This paper was on the table; the testator was near by, within three or four feet, as one of the witnesses says, another placing him more remote. The paper now offered for probate is the paper written by Kenrick, and attested by him as is shown by the proof of the handwriting of Kenrick. If any fraud has been practised as to the substitution of any other paper, it must have been by the agency of Kenrick. There is nothing in the case to authorize any such charge of fraud, and certainly fraud is

not to be presumed. In our opinion, it may be safely assumed that this is the instrument referred to, by the testator; and if so, the evidence is clearly sufficient to authorize the inference that he acknowledged the signature of the will to be his by his acts, though he did not expressly so state.

The court have not overlooked the circumstance that the form of signing this will by the testator was the making of a mark, and the name appended was written by Kenrick, the witness. Such form of signature is a perfectly legal one. It might in some cases furnish greater facility for fraudulent substitution of a false paper; but in the present case there is nothing to countenance any such supposition.

The court are of opinion that the decree of the judge of probate, allowing and admitting to probate this will, be affirmed, with costs in this court for the appellee.